## Commonwealth *v.* Brown, Appellant.

Argued November 16, 1972.  Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Joseph Michael Smith,* with him *F. Emmett Fitz-patrick, Jr.,* and *Fitzpatrick & Smith,* for appellant.

*James J. Wilson,* Assistant District Attorney, with him *James T. Ranney,* and *Milton M. Stein,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, March 16, 1973:

On May 19, 1969, Robert Carter was shot and killed inside the Opus I Bar at North 27th Street, Philadelphia. The facts surrounding the killing indicated to the police that it was probably a "gang" slaying, involving two gangs in the neighborhood—the 28th and Oxford Gang and the 28th and Montgomery Gang. Appellant, a member of the 28th and Oxford Gang, was awakened from his sleep and taken to the police station at some time between 3:30 and 4:00 in the morning. Apparently appellant was one of several people picked up in connection with the killing, presumably because of his membership in a gang which was thought to be involved. There was no probable cause for the arrest. In fact, in the words of the officer involved, there was no arrest. Appellant was merely "picked up for investigation."

At the suppression hearing, the officer testified as follows: "Q. Where did you arrest him, Officer? A. I did not actually arrest him. Upon information received from the Homicide Division, I went to his home to see if he was home. If he was home, I was to send him

down to the Homicide Division so that they could talk to him. He was merely picked up by myself as the result of a memorandum from the Homicide Investigation. He was to be picked up for investigation. Q. You did not arrest him? A. No, sir. Q. You did not have a warrant? A. No, sir."

Within one hour after his arrival at the police station, after being given the proper *Miranda* warnings, the appellant orally confessed to the crime and stated that he had given the gun he used in the killing to Samuel Winns, a fellow gang member. As a result of this information Winns was picked up and a search warrant was obtained for Winn's residence. A search of this residence led to the discovery of the murder weapon.

Questioning of appellant continued intermittently from the 4:00 arrest until 9:45 a.m., when the taking of a formal typewritten statement commenced. This statement was signed by appellant at 11:10 a.m.

On January 6, 1971, after a previous trial had ended with a deadlocked jury, appellant was tried by a jury and on January 21, 1971, they returned a verdict of guilty of second-degree murder. After denial of his post-trial motions and entry of the judgment of sentence of ten to twenty years' imprisonment, appellant filed this appeal.

Appellant first alleges that his previous trial, which resulted in a hung jury, barred his final trial due to the constitutional provisions against double jeopardy. The previous trial began on October 14, 1970. The jury retired to deliberate on October 20, 1970, and deliberated through October 23, 1970, at which time the jury announced that it could not agree on a verdict. The trial judge, observing the deadlock and that two jurors were ill and a third juror was pregnant and required medical attention, declared a mistrial. It is agreed that both

the attorney for the Commonwealth and counsel for appellant acquiesced to the mistrial. In *Commonwealth v. Kent*, 355 Pa. 146, 49 A. 2d 388 (1946), we were presented with a factual situation similar to that of the instant case. In *Kent*, supra, we stated that the illness of a juror and the deadlock of the jury brought the case within the rule authorizing a judge to discharge a jury in a capital case without resulting in an acquittal of the defendant. See also *Commonwealth ex rel. Montgomery v. Myers*, 422 Pa. 180, 220 A. 2d 859 (1966).

In *Commonwealth v. Spencer*, 442 Pa. 328, 275 A. 2d 279 (1971), we adopted the American Bar Association Standards Relating to Trial by Jury, which provide, in part: "(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

In determining whether the jury is truly deadlocked, so that a mistrial may be declared, a trial court must keep in mind what we said in *Commonwealth v. Ferguson*, 446 Pa. 24, 29, 285 A. 2d 189 (1971), quoting *United States v. Jorn*, 400 U.S. 470 (1971): ". . . in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."

Considering the facts of the instant case, where the jury declared themselves hopelessly deadlocked after twenty-four hours of deliberation over a three-day period and three of the jurors required medical attention, the court was correct in its declaration of a mistrial for reasons of "manifest necessity."

Appellant argues that the trial court could have recalled the alternate jurors to replace those who needed medical attention. However, the alternate jurors,

as is customary, were discharged after the conclusion of the court's final charge, and were no longer part of the case.

Appellant, in addition to arguing that the rule of "manifest necessity" was not met, also argues that it was improper for the court to declare a mistrial without his consent. Appellant's brief indicates that his trial counsel acquiesced the declaration of a mistrial. As we indicate herein, the declaration of a mistrial for reasons of a hung jury does not require the acquiescence of counsel.

Appellant seems to be confusing the situation where a mistrial is declared under Rule 1118 of the Pennsylvania Rules of Criminal Procedure, *Commonwealth v. Lauria,* 450 Pa. 72, 297 A. 2d 906 (1972), with the situation where a mistrial is declared because the jury is hopelessly deadlocked. Rule 1118 applies only to situations where a mistrial is declared due to a prejudicial event occurring at trial. Rule 1118 states: "(b) A motion to declare a mistrial shall be made when the *prejudicial event* is disclosed. In all cases only the defendant or attorney for the defendant may move for a mistrial." (Emphasis supplied.)

This rule covers only those situations where an event which is prejudicial to the defendant occurs. It does not deal with the situation of a hung jury. If Rule 1118 were the sole means to declare a mistrial and the defendant did not move for a mistrial, the jury would be forced to reach a verdict after they had stated that they were deadlocked, with the possibility that a lone juror, who was in opposition to the majority, would ultimately be coerced into voting with the majority just to bring an end to the deliberation. Such a possibility would fly in the face of our Anglo-American system of jurisprudence. See also *Commonwealth v. Campbell,* 445 Pa. 488, 284 A. 2d 798 (1971).

In such cases, although no event "prejudicial" to the defendant occurred during the trial, "manifest necessity" requires the declaration of a mistrial. The trial judge has always had the inherent power to declare a mistrial in such situations.

Appellant next argues that his confession was the product of an illegal arrest and should not have been admitted into evidence. In *Davis v. Mississippi*, 394 U.S. 721 (1969), the Supreme Court of the United States was presented with a situation similar to the instant case. In *Davis, supra*, mass arrests were conducted and persons fitting a general description of the assailant were arrested. Fingerprints were then taken of the people arrested and matched with those at the scene of the crime. At Davis' trial, the fingerprints were introduced. The Supreme Court, in reversing Davis' conviction, speaking about mass arrest situations without probable cause, stated: "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether those intrusions be termed 'arrests' or investigatory detentions." At pp. 726, 727. See *Commonwealth v. Fogan*, 449 Pa. 552, 296 A. 2d 755 (1972), where we said: ". . . we specifically condemn this type of 'dragnet arrest' and particularly where it results in hours of involuntary confinement. Such a practice can only lead to the illegal and unjust detention of innocent persons and raise serious doubts in the minds of all good citizens as to whether or not the police live within the law they are charged with upholding."

While the Commonwealth admits that the arrest of petitioner may have been illegal, it alleges that his confession was not a product of that illegal arrest, relying upon *Commonwealth v. Bishop*, 425 Pa. 175, 228 A. 2d 661 (1967). In *Bishop*, we laid down the rule that: "if the connection between the arrest and the confes-

sion is shown to be so vague or tenuous 'as to dissipate the taint' or 'sufficiently an act of free will,' the confession is admissible, despite the illegality of the arrest. By 'sufficiently an act of free will,' we mean that not only was the confession truly voluntary, but also free of any element of coerciveness due to the unlawful arrest." At page 183. (Emphasis in original.) See also *Commonwealth v. Fogan, supra.*

However, we do not believe that the Commonwealth has met the test laid down in *Bishop.* See also, *Betrand Appeal,* 451 Pa. 381, 303 A. 2d 486 (1973).

In *Wong Sun v. United States,* 371 U.S. 471 (1963), the Supreme Court of the United States considered a factual situation not too different from the instant case. In *Wong Sun,* federal agents illegally arrested a man named Toy in his bedroom and immediately after his arrest he gave incriminating statements. The Supreme Court, speaking about those statements of Toy, said: "The Government argues that Toy's statements to the officers in his bedroom, although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from 'an intervening independent act of a free will.' This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Page 486.

In the instant case, appellant, a young boy, was aroused from his sleep and was taken from his home by two officers at 4 o'clock in the morning, at which time he was taken to police headquarters. He was isolated in the interrogation room and questioned by two

officers. After constant questioning, at a time when he may have been barely awake, he orally confessed and this led directly to the written confession.

Although both cases involve illegal mass arrests, there are important distinctions between this case and *Commonwealth v. Fogan, supra.* In *Fogan,* although the defendant was picked up illegally and questioned immediately, the questioning did not produce a confession. Rather, Fogan did not confess until a fellow gang member, Tyree Wesley, had identified him as the killer, some six hours after the initial questioning of Fogan had terminated. Under those circumstances, the Commonwealth was able to persuade us that the confession was free of the coerciveness inherent in the unlawful arrest. However, in the instant case, appellant's confession followed soon after the illegal arrest and the Commonwealth is unable to persuade us that it had any other evidence which would have led to a lawful arrest of appellant and a lawful confession.

The Commonwealth argues that the fact that appellant was given his proper *Miranda* warnings before confessing should be enough to purge the taint of the illegal arrest. To accept such an argument would be to permit the Commonwealth in the course of its investigation to arrest an unlimited number of individuals and to confine them all illegally, hoping that one of their number would voluntarily confess to the crime. This we will not permit. *Betrand Appeal, supra.*

Judgment of sentence reversed and case remanded to the Court of Common Pleas, Criminal Trial Division, of Philadelphia County, for a new trial.

Mr. Justice POMEROY joined in this decision.

Mr. Chief Justice JONES took no part in the consideration or decision of this case.

Mr. Justice EAGEN, Mr. Justice POMEROY, Mr. Justice NIX and Mr. Justice MANDERINO concur in the result.